UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TERRY HARBIN, | CASE NO. 5:21-CV-00617-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Terry Harbin filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 18, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 26, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Harbin filed for DIB and SSI on November 28, 2016, alleging a disability onset date of February 12, 2015. (Tr. 227-41). The claims were denied initially and on reconsideration. (Tr. 71-95, 98-137). He then requested a hearing before an Administrative Law Judge. (Tr. 161-62). Mr.

Harbin (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on April 17, 2020. (Tr. 38-71). On May 13, 2020, the ALJ issued a written decision finding Mr. Harbin not disabled. (Tr. 14-32). The Appeals Council denied Mr. Harbin's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 6-8; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Harbin timely filed this action on March 18, 2021. (ECF #1; *see also* Tr. 1-2).

FACTUAL BACKGROUND

I.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Harbin and VE Teresa Trent, presented during the hearing before the ALJ.

Mr. Harbin testified he last worked as a truck driver in February 2015 hauling pipe to oilfields. (Tr. 45). He stopped working this job after an accident. (*Id.*). He attempted to return to work in a light duty capacity, but only for a little while. (*Id.*). He had previously worked in a meat factory packaging hams. (Tr. 47). He was laid off from the factory during a voluntary furlough, after which he obtained his CDL and began driving 18-wheelers. (Tr. 46-47).

Mr. Harbin left high school in ninth grade. (Tr. 49). He has not obtained a GED. (*Id.*).

At the factory, Mr. Harbin was on the packing line as a scale operator and was required to lift 60 to 70 pounds in that position. (Tr. 48). As a truck driver, he had to lift and throw tire chains weighing around 70 pounds. (Tr. 61). He now has difficulty lifting his three-year-old son. (Tr. 49-50).

Mr. Harbin is no longer able to drive. (Tr. 49). He has poor range of motion in his neck after an anterior cervical discectomy and fusion (ACDF) surgery and has back pain and discomfort

2

after an hour. (*Id.*). He was advised by a surgeon that he should not drive semis because the vibrations could shift the orthopedic hardware out of place. (Tr. 49-50). He has difficulty standing—"I just can't really stand anymore" is his explanation—due to the nature of his injuries post-accident. (Tr. 49). Mr. Harbin is unable to help with dishes or do household chores because his back gives out and his knees are weak. (*Id.*).

Mr. Harbin testified a doctor had just diagnosed him with arthritis in his knees and lower back, confirmed by X-ray. (Tr. 49-54). He has four thoracic herniated discs. (Tr. 50). He also has weakness in both wrists and fingertips; he frequently loses his grip. (Tr. 50-51). He has experienced problems with losing his grip since the 2015 accident, but his grip had been worsening recently. (Tr. 50*)*. Mr. Harbin has had difficulty reaching overhead with both arms since the accident. (Tr. 51). He described worsening muscle cramping, numbness in his forearms traveling up to his shoulders, and pain. (*Id.*). Mr. Harbin uses a cane to walk; when he does not use the cane, he loses his balance and falls. (Tr. 53). He last fell three weeks before the hearing. (*Id.*). Mr. Harbin visits a pain management clinic and is prescribed Percocet and Oxycodone for the pain and an anti-inflammatory to reduce swelling. (Tr. 51-52). Mr. Harbin has difficulty sitting due to his back issues and pain. (Tr. 54).

Mr. Harbin also has other significant health issues, including chronic heart failure, emphysema, and edema. (*Id.*). Mr. Harbin underwent a cardiac ablation in 2017 after issues with atrial fibrillation. (Tr. 55). He has nightly issues with edema because his chronic heart failure causes his legs to retain water. (*Id.*). Mr. Harbin's medication has been increased in an attempt to reduce the edema. (Tr. 56). Mr. Harbin also attributes these chronic issues to continued

complications from the 2015 accident; he underwent Department of Transportation physicals annually and had "pretty good health" prior to the accident. (Tr. 55).

Mr. Harbin uses a BiPAP at night because of his obstructive sleep apnea. (Tr. 56-57). He has difficulty using it because of a broken nose; his doctor had scheduled an MRI of his nose and sinuses to determine the cause of his problems. (*Id.*). Mr. Harbin uses Flonase nasal spray and is on three milliliters of oxygen at night. (Tr. 57). Mr. Harbin used to smoke cigarettes, but had not smoked for the two months prior to the hearing. (Tr. 58).

Mr. Harbin sees a psychiatrist and is on Lexapro and Buspirone. (Tr. 57). He takes multiple medications for his blood pressure, cardiac issues, cholesterol, depression, and PTSD. (Tr. 59). He takes his medications as prescribed, daily. (*Id.*). He experiences memory issues as a side effect of his medication. (Tr. 59-60).

VE Trent then testified. The ALJ identified Mr. Harbin's past work as a packager/scaler, performed at a heavy exertional level, and truck driver, performed at a medium exertional level. (Tr. 62-63). The ALJ posed the first hypothetical, assuming an individual as the same age, education, and work experience as Mr. Harbin. (Tr. 63). The individual would be able to work at a light level of exertion; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; frequently balance, stoop, kneel, crouch, and crawl; never use moving machinery or be exposed to unprotected heights; and can perform unskilled work at an SVP[1] of 1 or 2, free of fast-paced production requirements and involving only routine workplace changes. (Tr. 63). The VE

---

[1] "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r Of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

responded with the following unskilled jobs in the national economy an individual so limited could perform: routing clerk (DOT[2] 222.587-038), SVP 2, unskilled, light, 35,000 jobs nationally; marking clerk (DOT 209.587-034), SVP 2, unskilled, light, 120,000 jobs nationally; and inspector (DOT 559.687-074), SVP 2, unskilled, light, 29,000 jobs available nationally. (Tr. 63-64).

The second hypothetical the ALJ posed had the same restrictions as the first, but the individual could occasionally stoop, kneel, crouch, never crawl, could never perform any commercial driving, could have occasional public contact, and occasionally do tasks with interaction with coworkers and superficial contact with others (meaning no negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others). (Tr. 64). The VE responded that the same jobs previously identified would remain. (*Id.*).

The third hypothetical built on the restrictions from the second, but further limited the individual to sedentary work, and the individual would need a hand-held assistive device for uneven terrain or prolonged ambulation. (Tr. 64). The VE identified the following jobs: bench assembler (DOT 706.684-030), SVP 2, unskilled, sedentary, 23,000 jobs nationally; packager (DOT 559.687-014), SVP 2, unskilled, sedentary, 15,000 jobs nationally; and sorter (DOT 521.687-086), SVP 2, unskilled, sedentary, 15,000 jobs available nationally. (Tr. 65).

If the individual were limited to frequent handling and fingering bilaterally, the available packager jobs would be reduced to 12,000 jobs nationally. (Tr. 65). No other jobs identified at light or sedentary exertional levels would be affected. (*Id.*).

---

[2]      The *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d).

But if the individual were limited to occasional overhead reaching bilaterally, none of the jobs identified at light or sedentary exertional levels would be affected. (Tr. 65-66).

If the individual were off-task more than ten percent of the workday, then all work would be precluded. (Tr. 66).

Mr. Harbin's attorney then questioned the VE for testimony if the individual in the second hypothetical (at light exertional level) required the use of a hand-held assistive device with regards to short and long distances and uneven terrain; and further limiting the individual to occasional reaching, handling, fingering, and feeling. (Tr. 67). The VE responded that would be work preclusive and all jobs at the light exertional level would be eliminated. (Tr. 67).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Harbin was 39 years old at the time of his alleged onset date, and 44 years old at the time of the administrative hearing. (Tr. 31, 49). Mr. Harbin completed ninth grade; he did not complete a GED. (Tr. 49). In the past, Mr. Harbin has been employed as a packager/scaler and as a truck driver. (Tr. 30).

## III.    RELEVANT MEDICAL EVIDENCE[3]

**BWC Examination.** Michael Smith, M.D., performed a BWC examination of Mr. Harbin on April 3, 2015. (Tr. 337). That examination arose from a February 12, 2015 car accident during which Mr. Harbin sustained whiplash that led to him receiving physical therapy and chiropractic treatment. (*Id.*). X-rays were negative for fracture. (*Id.*). Mr. Harbin was able to rise and descend

---

[3]    Mr. Harbin's argument focuses narrowly on the ALJ's determination of Mr. Harbin's residual function capacity (RFC) with respect to his bilateral upper extremity limitations. (*See* Pl.'s Br., ECF #13, PageID 1138 n.1). Mr. Harbin has submitted a Plaintiff's Supplement outlining the facts pertinent to his argument. (ECF #13-1, 13-2). I therefore summarize here the relevant evidence as raised in the Supplement Mr. Harbin submitted.

from the examination table without difficulty. (*Id.*). Mr. Harbin complained of tinging and numbness, worse on the left than on the right. (*Id.*). Sensory examination showed a radicular distribution of pain, left greater than right. (*Id.*).

Dr. Smith recommended Mr. Harbin complete his physical therapy program. (*Id.*). If he did not improve with conservative treatment, Dr. Smith indicated Mr. Harbin was a candidate for a two-level ACDF, and provided information on the procedure. (*Id.*).

**Pain Management.** Mr. Harbin saw Gamaliel Batalla, M.D., on October 21, 2016 for pain management. (Tr. 554). Mr. Harbin had been complaining of mid- and low back pain since the February 2015 accident. (*Id.*). Dr. Batalla indicated Mr. Harbin's neck pain had resolved after the ACDF surgery. (*Id.*). However, Mr. Harbin exhibited increased pain on range of motion of the lumbar spine, and cervical and thoracolumbar paraspinal muscle spasm and tenderness. (Tr. 555). Motor strength was 5/5 in all extremities. (*Id.*). Dr. Batalla identified low back pain and myofascial pain syndrome. (*Id.*). Dr. Batalla ordered thoracic and lumbar spine imaging. (*Id.*).

Mr. Harbin followed up with Dr. Batalla's office on November 22, 2016 and was treated by Michael Smith, PA. (Tr. 569). Mr. Harbin reported his pain was a seven on a ten-point scale. (*Id.*). Treatment notes indicate Mr. Harbin was experiencing some difficulty with his activities of daily living secondary to pain. (*Id.*). Mr. Harbin exhibited tenderness to palpation in the cervical, thoracic, and lumbar region with spasms in the trapezius, paraspinal, and latissimus dorsi muscle groups. (*Id.*). Mr. Harbin's updated diagnosis included lumbar degenerative disc disease, lumbar spondylosis, cervical spondylosis, myofascial pain syndrome, and thoracic spondylosis. (*Id.*). PA Smith continued Mr. Harbin on Percocet and scheduled diagnostic bilateral L2-L5 median branch blocks. (*Id.*).

7

**Emergency Department.** Mr. Harbin presented to the emergency department on July 22, 2019, complaining of right neck pain and stiffness, with symptoms for the past four days. (Tr. 815). Pain was focused in the lateral neck, extending down into the trapezius. (*Id.*). The symptoms were consistent with an acute muscular spasm and he was treated with a Norflex injection. (Tr. 817). Mr. Harbin had been without pain medication for multiple months; he was provided with a short supply of pain medication and muscle relaxants and recommended to follow up with his primary care physician. (Tr. 819).

## IV.  MEDICAL OPINIONS

**State Agency Opinions.** State agency medical consultants reviewed Mr. Harbin's record at the initial and reconsideration levels. (Tr. 72-137).

At the initial level, State agency consultant Mehr Siddiqui, M.D., reviewed Mr. Harbin's medical records on February 10, 2017 and found that Mr. Harbin could perform light work, except that he could occasionally climb ladders, ropes, and scaffolds; frequently balance, kneel, crawl, crouch, and climb ramps and stairs; and must avoid all exposure to unprotected heights and dangerous machinery. (Tr. 79-83, 91-95). Dr. Siddiqui noted Mr. Harbin's stated difficulty with stairs, limping, and requiring a cane; however, Dr. Siddiqui also noted that these were not mentioned in the medical records other than as a slightly antalgic gait, with normal gait in the most recent examination. (Tr. 78-79, 90-91). Mr. Harbin was determined not disabled. (Tr. 82, 94).

On reconsideration, State agency consultant George Klyop, M.D., reviewed Mr. Harbin's medical records on February 20, 2019 and affirmed Dr. Siddiqui's RFC findings. (Tr. 110-12, 130-32) ("RFC from initial claim has been reviewed and appears consistent with the evidence.

Therefore it is being affirmed as written at reconsideration level."). Mr. Harbin was determined not disabled on reconsideration. (Tr. 116, 136).

**Consultative Examination. O**n February 2, 2019, Mr. Harbin underwent a consultative examination with Haariss Ilyas, M.D. (Tr. 781-85). Mr. Harbin complained of herniated discs, for which he had surgery, physical therapy, and medication. (Tr. 781). Mr. Harbin reported his pain was over a ten on a ten-point scale most days, and at a ten on the day of examination. (*Id.*). Mr. Harbin stated the pain affects his ability to work secondary to his difficulty sitting, standing, walking, bending, and lifting. (*Id.*).

Mr. Harbin exhibited an asymmetric and slow gait on examination. (Tr. 783). He used a handheld assistive device (cane), but was able to walk around the examination room without it. (Tr. 783-84). There was diffuse tenderness of the bilateral upper and lower extremities. (Tr. 784). Mr. Harbin was able to lift, carry, and handle light objects, and exhibited grossly normal fine and gross manipulation. (*Id.*). Mr. Harbin was "clearly unable" to heel, toe, or tandem walk, and could not stand and hop on one foot bilaterally. (*Id.*). Mr. Harbin had difficulty getting up and down from the examination table. (*Id.*).

Dr. Ilyas indicated Mr. Harbin was cooperative but did not give good effort on examination. (*Id.*). Dr. Ilyas noted "what appears to be an over-exaggerated pain to light touch or range of motion of his ankles, knees, hips or shoulders." (*Id.*). However, Dr. Ilyas also indicated Mr. Harbin may have adhesive capsulitis of the bilateral shoulders and decreased range of motion, which may be further evaluated by radiography. (Tr. 784-85). Dr. Ilyas noted Mr. Harbin's reports of ongoing back pain, which likely is myofascial and muscular ligamentous in nature, as Mr. Harbin did not have stenotic or radicular complaints. (Tr. 785).

9

In Dr. Ilyas's opinion, Mr. Harbin has no limitations with sitting, moderate limitations with standing, and severe limitations with walking due to back pain. (*Id.*). Mr. Harbin requires use of a cane for short and long distances and uneven terrain. (*Id.*). Mr. Harbin has severe limitations with lifting and carrying weight due to back pain. (*Id.*). Mr. Harbin is limited to occasional stooping, crouching, and squatting; he was limited to occasional reaching due to back pain; and occasional grasping, handling, fingering, and feeling due to shoulder pain. (*Id.*).

## V.    OTHER RELEVANT EVIDENCE

**Imaging Results.** MRIs taken in April 2015 of Mr. Harbin's lumbar, thoracic, and cervical spine showed two-millimeter protrusions on the left side at C5-C6 and at C6-C7, and mild cord compression. (Tr. 337). Another cervical X-ray showed minimal cervical degenerative changes. (*Id.*).

X-rays of Mr. Harbin's cervical spine taken January 30, 2019 showed degenerative and postoperative changes. (Tr. 1023). The C5-C7 fusion had intact hardware and satisfactory alignment. (*Id.*). There was moderate anterior marginal spurring at C6-C7 without disc space narrowing, and multilevel facet arthropathy. (*Id.*).

Lumbosacral X-rays from February 2, 2019 (compared to views from September 10, 2010) showed minimal retrolisthesis at L3-L4 and L2-L3, similar to the earlier study. (Tr. 790). Sacroiliac joints were normal, and the sacrum was intact. (*Id.*). No disc space narrowing was present. (*Id.*). There was mild lower lumbar spine facet arthropathy. (*Id.*).

Cervical spine X-ray taken during a July 22, 2019 visit to an emergency room showed no acute fracture. (Tr. 817). Hardware from his previous surgery appeared to be in place without loosening. (*Id.*).

A lumbar spine X-ray from February 2, 2020 showed scattered mild degenerative endplate changes. (Tr. 851). Mild disc height loss was noted at L2-L3, L3-L4, and L5-S1. (*Id.*). Mild facet arthropathy was noted within the lower lumbar spine at L5-S1 and L4-L5. (*Id.*). Overall, findings were of mild degenerative changes of the lumbar spine, with no acute findings. (*Id.*). Cervical spine X-rays from the next day show maintained disc spaces and vertebral body heights, and noted postoperative changes of the ACDF surgery. (Tr. 855).

**Vocational Rehabilitation.** Mr. Harbin was provided with vocational rehabilitation through the BWC after the February 2015 accident. (*See* Tr. 430-32). As of December 2, 2015, Mr. Harbin's vocational rehabilitation case was closed for medical instability. (Tr. 430). Mr. Harbin was determined not medically stable for participation in vocational rehabilitation because he was proceeding with a cervical fusion. (Tr. 431). Mr. Harbin's treatment was conservative in nature to that point, consisting of occupational and chiropractic therapies. (*Id.*). Mr. Harbin had the ACDF surgery on December 7, 2015 and was discharged the next day. (Tr. 457). Mr. Harbin was determined to have reached maximum medical improvement post-surgery for the purposes of his BWC claims. (Tr. 430).

### THE ALJ'S DECISION

The ALJ's decision, dated May 13, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant engaged in substantial gainful activity during the following periods: February 12, 2015 through April 15, 2015 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

11

3.     However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.     The claimant has the following severe impairments: obesity, obstructive sleep apnea, chronic heart failure/recurrent arrhythmias/hypertension [hereinafter, collectively, the "cardiac impairment"], degenerative disc disease of the cervical spine, status-post fusion and degenerative disc disease of the lumbar spine [hereinafter, collectively, the "back disorder"], unspecified anxiety disorder, post-traumatic stress disorder, major depressive disorder and bipolar disorder. (20 CFR 404.1520(c) and 416.920(c)).

5.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant may occasionally stoop, kneel, crouch, climb ramps and stairs, but may never crawl, climb ladders, ropes or scaffolds; the claimant may occasionally reach overhead with the bilateral upper extremities; the claimant must be afforded the use of a cane for uneven terrain or prolonged periods of ambulation; the claimant must avoid exposure to unprotected heights, moving machinery or commercial driving; the claimant is limited to the performance of unskilled work [catalogued by the Dictionary of Occupational Titles as specific vocational preparation factors one and two], undertaken in a work setting free of fast-paced production requirements, or more than routine workplace changes, which setting requires no more than occasional, superficial [defined as precluding tasks involving arbitration, negotiation, confrontation, the direction of, persuasion of, or conferral of responsibility upon the claimant for the safety or welfare of, others] interaction with co-workers or the public.

7.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.     The claimant was born on November 19, 1975 and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

12

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from February 12, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-32).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Harbin argues the ALJ erred in finding Mr. Harbin retained a sedentary RFC with occasional reaching overhead but no manipulative limitations.[4] (Pl.'s Br., ECF #13, PageID 1136). He states the ALJ's finding was not supported by substantial evidence and was based on an improper evaluation of the objective evidence and the opinion of the state consultative examiner, Dr. Ilyas. (*Id.* at Page ID 1136, 1142-44).

The Commissioner acknowledges that Mr. Harbin has significant limitations and can only perform a reduced range of sedentary work. (Comm'r's Br., ECF #15, PageID 1159). The Commissioner further asserts that the ALJ considered the objective medical evidence Mr. Harbin cites, that Dr. Ilyas's findings on examination were benign, and the opined limitations were not consistent with Dr. Ilyas's single examination, particularly when compared to other medical evidence in the record. (*Id.* at PageID 1159, 1162-67). According to the Commissioner, the ALJ thoroughly evaluated all evidence in the record—objective and subjective—and created a less-than-sedentary RFC that was responsive to Mr. Harbin's limitations and supported by the objective and opinion evidence in the record. (*Id.* at PageID 1163-67).

I, too, acknowledge Mr. Harbin's significant limitations that have largely resulted from no fault of his own—many of his complaints stem from a workplace accident where he was struck by another driver. (Tr. 337). But the substantial evidence standard of review is a constraining one in

---

[4]      Mr. Harbin states: "The Administrative Law Judge found Plaintiff retained a residual functional capacity for a range of sedentary work with occasional reaching but frequent manipulative limitations." (Pl.'s Br., ECF #13, PageID 1136). I note the ALJ included mild manipulative limitations in the RFC (occasional overhead reaching), but did not include limitations for the bilateral lower extremities, frequent or otherwise. (*See* Tr. 23). I therefore respond to Mr. Harbin's argument as an RFC unresponsive to his need for manipulative limitations for his bilateral lower extremities such as handling and fingering, if any.

which courts must give significant deference to the ALJ's "zone of choice." *Mullen*, 800 F.2d at 545. Given that the ALJ supported his RFC with an analysis of the record evidence in accordance with the regulations, I cannot step into the ALJ's shoes and reweigh or reevaluate the evidence. I am thus constrained to recommend the District Court affirm.

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1546(c) 416.946(c). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Webb*, 368 F.3d at 632.

Agency regulations direct the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The RFC determination must be based on all relevant medical and other evidence, including limitations resulting from other symptoms, such as pain. 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3).

Further, the ALJ is vested with the discretion to weigh all the evidence, resolve material conflicts, make independent findings of facts, and determine the case accordingly. *Richardson v.*

*Perales*, 402 U.S. 389, 399-400 (1971); *see also Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p. An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

But the district court may not step into the ALJ's shoes and try the case *de novo* or resolve any purported conflicts in evidence. *Collins*, 357 F. App'x at 668. It is the limited role of this Court to determine whether there is substantial evidence in the record, taken as a whole, to support the findings. *Jones*, 336 F.3d at 477. This Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. This Court will not second-guess an ALJ's decision, if the ALJ cites to substantial evidence. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012).

Here, the ALJ created the following RFC:

I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant may occasionally stoop, kneel, crouch, climb ramps and stairs, but may never crawl, climb ladders, ropes or scaffolds; the claimant may occasionally reach overhead with the bilateral upper extremities; the claimant must be afforded the use of a cane for uneven terrain or prolonged periods of ambulation; the claimant must avoid exposure to unprotected heights, moving machinery or commercial driving; the claimant is limited to the performance of unskilled work [catalogued by the Dictionary of Occupational Titles as specific vocational preparation factors one and two], undertaken in a work setting free of fast-paced production requirements, or

more than routine workplace changes, which setting requires no more than occasional, superficial [defined as precluding tasks involving arbitration, negotiation, confrontation, the direction of, persuasion of, or conferral of responsibility upon the claimant for the safety or welfare of, others] interaction with co-workers or the public.

(Tr. 23). Mr. Harbin alleges this RFC is not supported by substantial evidence, because it does not incorporate the type of manipulative limitations Mr. Harbin needs. (Pl.'s Br., ECF #13, PageID 1141-43). In support, he points to Dr. Ilyas's opinion that Mr. Harbin "had no limitations with sitting; moderate limitations with standing; severe limitations with walking; that he needs a cane for short and long distances and uneven terrain; he had severe limitations with lifting and carrying; he should only occasionally bend, stoop, crouch, and squat, as well as reach, grasp, handle, finger, and feel." (*Id.* at PageID 1143, *citing* Tr. 785). Mr. Harbin reiterates his hearing testimony that "his hands and wrists were weak and tingly and numb, and he lost his grip all the time. He said when he gripped or picked up something, the pain would go from his hands up to his shoulders in both arms." (*Id.*, *citing* Tr. 50-51). He also references his complaints of, *inter alia*, arm numbness, spine tenderness, and muscle spasm made during pain management appointments with Dr. Batalla. (*Id.* at PageID 1142, *citing* Tr. 554-55, 569).

But Mr. Harbin does not point to evidence that the ALJ failed to consider in determining the RFC. When evaluating Dr. Ilyas's and Dr. Batalla's examinations, the ALJ stated:

> Clinical examinations included in the record have consistently, albeit not universally, reported either minimally adverse, or benign findings, including one dated October 21, 2016, which indicated tenderness and spasms in the cervical and lumbar spine, but with . . . normal sensory function and strength, or one dated February 2, 2019, which indicated . . . normal strength, sensory function, reflexes . . . [and] normal coordination.

(Tr. 25, *citing* Tr. 555, 781-85). Mr. Harbin also acknowledges Dr. Ilyas's benign examination findings, stating: "[Mr. Harbin] had diffuse tenderness of the upper and lower extremities and was

able to lift, carry, and handle light objects." (Pl.'s Br., ECF #3, PageID 1142-43, *citing* Tr. 784). The ALJ noted Mr. Harbin's treatment with Dr. Batalla: "The claimant briefly followed a regimen of formal pain management, but did not return to pursue the recommended course of medial branch block injections." (Tr. 25, *citing* Tr. 550-582).

After considering the symptom evidence, the ALJ concluded that Mr. Harbin's limitations were not as severe as alleged, and could be accommodated through a sedentary RFC with additional limitations. (Tr. 26).

Regarding Dr. Ilyas's opinion evidence, the ALJ stated:

> The consultative examiner, Haariss Ilyas, M.D., indicated that the claimant would have moderate limitations standing, severe limitations walking, would need use of a cane, would have severe limitations lifting and carrying, could occasionally bend, stoop, crouch, squat, could occasionally reach, grasp, handle and finger. Dr. Ilyas examined the claimant on a single examination and is reporting within the bounds of his professional certifications. However, the basis for all of his limitations is back and shoulder pain (16F/5). The objective examination was largely benign, despite what Dr. Ilyas noted as poor effort and an exaggerated pain response (16F/4). By comparison to the overall evidence of record, described in digest form in the preceding paragraph, this opinion is only marginally consistent with, and supported by, the evidence of record and is afforded little weight.

(Tr. 28-29). In the preceding paragraph, the ALJ noted that "clinical examinations have consistently reported preserved strength and neurological function, including gait, and coordination . . . ." and described "[t]he postural limitations have been adjusted in consideration of the claimant's residual effects from cervical surgery, and mild manipulative limitations have been added for that same reason." (Tr. 28) (internal citations omitted).[5]

---

[5]     Overhead reaching is a manipulative limitation. *See* 20 C.F.R. §§ 404.1545(b), 416.945(b).

The ALJ considered Dr. Ilyas's examination and incorporated many of the opined limitations into the RFC. (*Compare* Tr. 781-85 *with* Tr. 23). The ALJ limited Mr. Harbin to sedentary[6] work (Dr. Ilyas opined no limitations to sitting, but limitations to Mr. Harbin's ability to lift and carry weight), included use of a cane for uneven terrain or prolonged periods of ambulation (Dr. Ilyas opined Mr. Harbin needs a cane for short and long distances and uneven terrain), limited Mr. Harbin to occasional stoop, kneel, crouch, climb ramps and stairs, never crawl, climb ladders, ropes or scaffolds (Dr. Ilyas opined Mr. Harbin could occasionally stoop, crouch, or squat), and the ALJ limited Mr. Harbin to occasional overhead reaching (same limitation opined by Dr. Ilyas). (*Id.*). The ALJ incorporated those limitations he deemed credible and supported by the record, and omitted the limitation he determined was not supported by the record.

Where Mr. Harbin's hearing testimony that he cannot grip objects, and Dr. Ilyas's opinion that Mr. Harbin needs a limitation to occasional manipulation, are not supported by the medical record or even by Dr. Ilyas's own examination findings, the ALJ may resolve that conflict and determine Mr. Harbin does not require manipulative limitations. Such a decision is within the ALJ's "zone of choice" and receives deference from a reviewing court. Given the narrow focus on manipulative limitations, I cannot say the ALJ's decision is unsupported by substantial evidence. I therefore recommend the District Court affirm.

---

[6]    Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying small objects such as files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a); 416.967(a).

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: May 19, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).